May it please the Court, Your Honors, Keohtani for Petitioner Appellant Dionne Wilmont. We respectfully are requesting that this Court grant Mr. Wilmont's habeas petition. Your Honors, this morning I would like to address three points. First, that the introduction of specific details from Mr. Wilmont's priors violated his due process rights. Second, that the prosecutor committed misconduct during closing argument such that he suffered a fundamental miscarriage of justice. And third, that the cumulative effect of errors in the trial deprived Mr. Wilmont of his fundamental right to a fair trial. First, Your Honors, I would like to today focus on how Mr. Wilmont was not really convicted on the facts of this case, but instead was convicted because of really bad facts in really old priors. The specific details of the priors were highly inflammatory and rendered the trial fundamentally unfair. The operative state decision in this case by the State Court of Appeals held that the details of the priors were relevant to whether Mr. Wilmont suffered from antisocial personality disorder or psychosis and went to the weight of the expert's testimony. However, Your Honors, this was objectively unreasonable. First, the experts did not deny that Mr. Wilmont had antisocial personality disorder. The experts both agreed that he had this disorder because they stated that he suffered from both, there was nothing to impeach, and it did not go to the weight of their testimony. Secondly, Your Honor, the relevant time period of this case was December of 2002, the date of the alleged offense. But the State Court decided that specific details from priors 10 to 14 years or more prior to this time were relevant to determine whether or not Mr. Wilmont had psychosis during December of 2002. Your Honors, this was actually irrelevant character evidence, and it was highly prejudicial. You weren't the trial attorney in the state conviction, and we're not criticizing you. But the attorney in the state conviction was well rehearsed by the trial judge before this trial ever started about the danger of putting him on the stand and the danger of putting these doctors on the stand. Because if they testified about his past criminal record, no jury that I've ever heard of would have acquitted him for anything. Once his priors came out in front of the jury, it didn't make any difference what the judge said about the instructions or anything else. The only issue in the case was, did he intend to steal when he went into these two houses? And his defense was, his lawyer's defense was, that he was too mentally disturbed to have any intent, except what he said, he was hungry and curious when he went in. But the instruction that was about flight and all those other things that you've raised as constitutional error were probably harmless after all this other stuff got in. About two of his burglary convictions were for rape or intent to rape, and juries wouldn't take that very kindly. And the fact that they were old convictions was not unusual because he was in custody all of the time in between his convictions, either in a mental hospital or in prison. And the statements of counsel about his being a Conwise ex-convict was basically true, but it was something that a trial judge would have corrected if this had been any other kind of a trial. But it was basically a sanity hearing in which he didn't plead not guilty by reason of insanity. He stayed as far away from that as he could get. And his theory, his counsel's theory was, first he tried to sanitize his record and that didn't survive the pretrial hearing on the record. The judge said, well, it depends on what you open up in the trial. And the defense proceeded to open that up beyond recall, so there wasn't much the district or the trial court could do about it. But I just wonder how do you get a constitutional error out of a mental hearing that turned out badly for the defendant? Your Honor, I believe there are two issues in there. I believe the court is first asking whether the actual error is assigned to the 402 hearing. And please correct me if I'm wrong. And then the second issue would be how that affected the trial. First off, as to the 402 hearing, at the time the defense counsel, as the court I know is aware, objected very strenuously to the experts being crossed on these specific details. And the reason why is that, again, it amounts to character evidence, which under our law is legally irrelevant. As Michelson put it, the reason why is that it's not rejected because it's irrelevant in the common sense world, but it is rejected as irrelevant under the law because such evidence weighs too much with the jury. It causes them to prejudge the defendant. It denies him an opportunity to defend against the specific charges with which he was charged upon that day. And the constitutional issue, Your Honor, comes in because of this. Because our – what we submit is that it was constitutionally irrelevant and that under Estelle and Boyd and Brinegar, Michelson, under the Brecht standard, that it did not – the specific details did not go to the point that the prosecution needed to make. It wasn't a substantive and crucial part of their case. And what it was was legally irrelevant character evidence that is not permissible and that violated his due process rights because, as the Court pointed out, once the jury heard those details, the jury was going to hate him and they were going to convict him. And that's what happened here. That's the prejudice prong of this. But why was the antisocial disorder theory relevant in this case? Your Honor, the antisocial theory was not relevant to the defense in this case. But the prosecutor brought up the fact that he had an antisocial personality disorder because the prosecution, understandably, was arguing that he wasn't under psychosis but he was a rule breaker. But, again, Your Honors, the – So how did – did the prosecution first put on this antisocial disorder evidence? No, Your Honor. This came up through cross-examination of the defense witnesses. The prosecution did not put on a witness – an expert witness. So why – to disprove – it was the State's burden to prove, Your Honor, reasonable doubt that your client had the intent to steal. So I don't – I don't understand why simply having an – this underlying details of the – of the crimes, prior crimes. Your Honor, we would argue that the – that the testimony did not, per force, lead to the introduction of these details. And, in fact, Your Honor, if in the transcript the prosecutor very ably crossed both experts on antipersonality disorder, what it meant, what people with that disorder had, how some people with psychosis alone would not commit crimes. This was all done without those details. Yet, once she had fully crossed without getting into these specific details, she then gratuitously went further and into these details which were unnecessary, which rendered the trial fundamentally unfair, and that we submit violated due process under the relevant authorities. Well, he took the stand, and I think probably against the original advice of counsel, but he insisted on taking the stand. He admitted every element of the crime except the intent to steal. And he was – it was pretty obvious in reading the transcript that he was mentally disturbed all the time during the trial, too. He didn't have any kind of a grip on reality at all. But the jury didn't know that, and they decided that he intended to steal because he rummaged through a couple of pieces of luggage in one of the houses. But he admitted going into two dwelling houses that were occupied at night, and he admitted that he actually rummaged a little bit in some of the luggage because he said he didn't leave any fingerprints. Your Honor, I wouldn't take that as admission. I think what he said was – again, he was very confused, and I think what he was really saying is, well, if there were no fingerprints, I didn't do that because, you know, I don't remember. But it was an unfortunate choice. But once the choice was made to put those two doctors on the stand and have them talk about his hospitalization record, this antisocial trait was going to come out. There wasn't any way to keep that from coming out. Yes, Your Honor, and we're not saying that that was error. But what we are saying is that was sufficient and the doctors testified to that sufficiently that the details of the priors should not have come in and that that was the error. So you're saying that was – so you win if the details were completely irrelevant. Yes, Your Honor. But the state court of appeals said that it was relevant because the evidence of the specifics of the priors was relevant to whether petitioners suffered from an antisocial personality disorder or a psychosis and went to the weight to be accorded to Cohen's testimony as he relied on records containing that diagnosis. So what you need to show is that that finding of relevance by the state court of appeals is objectively unreasonable. Yes, Your Honor. Okay. So how is it objectively unreasonable? It's objectively unreasonable, Your Honor, because the state appellate court fundamentally misunderstood, as is apparent from what the Court just read, because it wasn't relevant to show whether he had psychosis or antisocial personality disorder because both experts actually said he has both. So it wasn't – He says both experts. Was there a prosecution expert? No. There were two experts. There was a treating psychologist and – That the defense put on. Yes. Right. And so what the Court's saying is you put on these experts now where you have to get into the detail to see what their foundation of their expert testimony as to the fact of the antisocial personality disorder. And that's what the trial court had ruled and told the trial counsel, that that was the danger of putting those people on. And my fundamental question is why was it even necessary to get into that when it doesn't undermine the element of intent? I'm sorry. I didn't understand. Why was it necessary to put in the evidence of antisocial disorder by the – why was it necessary for the defense to go there when it doesn't necessarily undermine whether or not he had the intent on the day he entered the houses? Your Honor, the defense didn't go there. On cross-examination, the prosecutor – But the defense put on the psychiatrist, right? Yes, Your Honor. I am right on that, right? Yes, Your Honor. Well, why? I'm sorry. I understand the question now, Your Honor. Okay. I'm almost out of time. I'd like to answer the question. Please answer the question. Thank you, Your Honor. The defense – I wasn't defense counsel. I know that. But my reading of the trial is that the defense counsel put on the experts because the treating psychologist and the psychiatrist together showed that there was this increasing psychosis that began from October, that on the date of the alleged offense, December 12th, not only the members of the household, but one of the police officers say that he's out of it, that he's immediately in a psychiatric ward in the jail, that he's incompetent for a year and a half or more before they can bring him in trial. My understanding of the motivations of defense counsel is that this is very objectively clear evidence that he was most likely incompetent on the day of the offense, and that was the reason he needed to put this in. As to the antisocial personality disorder, again, once they've admitted that, they were crossed on it, there was no need to bring in the specific details which we object to. I know that I'm out of time, Your Honor. If the Court would like to hear anything on the other issues, I could briefly just state that they're covered in the brief. Yeah, they're covered in the brief. Thank you very much, Your Honor. Thank you. I would just say I don't need to hear other issues now, but if Judge Wardlaw doesn't mind, I would appreciate letting appellant's counsel have one minute for rebuttal so we can hear the slant that he's got on whatever the government says. That's fine. Thank you very much, Your Honor. Good morning, Judges. Carl Henry for the California State Prison Custodian. May it please the Court. One quick housekeeping point, Judge. The name change for the respondent was due to the fact that we filed a substitution of party requests. The warden changed. Who is the warden? The current warden, as stated in the appellee's brief, is Scott McKeon. McKeon. Okay. The warden changed as time marched on, as did the Secretary of the California Department of Corrections, so that name is amply stated in the appellee's brief as Matthew Cate. Okay. Thank you. That said, the Court should affirm on any basis it chooses to that's grounded in the record. I will address the concerns that were raised here. Can I just say, this is a really troubling case, because Wilmont was obviously suffering from a lot of mental disorders, and who knows how they affected these prior crimes. I mean, when you get into the details of the prior crimes, they're pretty bizarre crimes. And I agree with Judge Goodwin that once those details came in, there is no way that any jury would acquit Wilmont. So I'm just wondering whether the State Court of Appeals' statement that those details were relevant is objectively unreasonable. We would disagree. I'm asking the question. I am wondering. So I want you to tell me why you think it wasn't objectively unreasonable. Well, first off, the determination of what the Court of Appeals, of course, found that it was not an abuse of discretion under California law to allow this evidence in. This court, of course, is bound by the State Court's interpretation of its own law. Right. But the key federal issue is whether the trial was fundamentally unfair under Estelle and McKinney. And if the evidence was irrelevant, then they probably could win. But we have the State Court finding that says the evidence was relevant. Yes. So really, to me, the case comes down to whether that was an objectively unreasonable finding. So I want you to explain to me why it was reasonable. First off, I was actually going to turn there, given the gravity of the questioning. Let me go beyond the briefs, but stay within the record. There were actually two 402 hearings in this case. One occurred just before jury selection on February 19th, and another one occurred five days later after the district attorney arrested her case. At the first hearing, just before jury selection, the DA, in essence, felt slightly sandbagged because she felt that she had no notice whatsoever of this potential testimony from Dr. Cohen. She received at that time a redacted report from the doctor, and counsel indicated, who, of course, was the county deputy public defender, indicated that he wasn't 100 percent sure he was going to put on the doctor. He wasn't 100 percent sure he was going to put on an appellant. He wanted to know what would be the magnitude of putting him on in light of these priors. To that extent, the prosecution also pointed out that, hey, I don't have a resume. I don't have a CV. I don't know what this person is going to say. I may need to call Dr. Sherman or some doctor to rebutt. I'm just caught off guard by all of this. The court, in essence, said, well, we'll defer ruling on this because you're not telling me whether or not, A, the appellant's going to testify, so that's one level of analysis for purposes of whether or not the priors would come in sanitized. The priors come in sanitized if Wilmont testifies. The judge hadn't ruled at that point yet. The judge said, since you're not telling me the appellant's going to testify, you want an advance billing on what my ruling's going to be, I'll defer ruling on all of this. You're not telling me whether or not Dr. Cohen is going to testify, and we don't know what Dr. Cohen is going to say, which was the prosecutor's objection. I've got this redacted report. I don't have any resume, so I don't know about this person. I'm hearing about this today, or actually the day before. I'll defer ruling on that. After the prosecution rested her case, we had a second 402 hearing. At that time, counsel A produced an unredacted report. B produced two additional reports concerning the doctor. Said, I have the doctor outside. He's prepared to give his 402 testimony. The court had already ruled with respect to sanitized priors coming in, because appellant was going to testify according to trial counsel, to which the judge said, okay, if appellant testifies, I will allow the sanitized version to come in. And the sanitized version being there were five priors involving moral turpitude. That's my ruling as to that. Dr. Cohen testified. During Dr. Cohen's testimony, as well as on cross, he indicated that he relied on various items, including the probation report, which made reference to the conviction history. But most significantly, particularly in light of the questioning today, he relied on the patent state record report, which was highly germane, highly relevant. Why? Because the report said two things. It said, on the one hand, there was psychosis or possible psychosis with respect to appellant. But it also said that his specific priors showed antisocial personality behavior, which showed that he was incapable of staying within the confines of the law and the social norms, which was the opposite of showing a psychosis. The doctor, Cohen, testified that he did not find any bearing, he had no bearing, the priors. And the district attorney rightfully said, how can that be when you've indicated that you've relied on the patent state records, which show that the priors had some bearing to show antisocial behavior? So he wanted to test the veracity of this doctor. He wanted the jury to have a fair and balanced picture of what the doctor was relying on. And it goes back to the 402 hearing initially, because at that time, trial counsel said, I realize this is a touchy subject. The judge said, you're in essence, the judge termed it a standing naked defense that he was coming to. He stood naked. He viewed it as standing naked. If you're standing naked before the jury, if you've got tattoos, they're going to show. If you've got warts, they're going to show. Be very, very careful. This is a very touchy issue. Going back to the second hearing, after Dr. Cohen testified and the arguments were presented by the parties, the judge then said, well, again, I'm going to allow the priors to come in sanitized as to the appellant, should he indeed testify. As to the doctor, Dr. Cohen, if he takes the stand before the jury and he says he did not rely on the priors, then you can't go there, Mr. Prosecutor. However, given what he said at the 402, he all but said he relied on, he did say, in fact, I relied on the priors. He just said it had no bearing. But he also said that the priors had bearing vis-à-vis what was in the patent state records report. Bearing meaning it showed antisocial behavior in addition to or in opposite of psychosis. That's how it became relevant. It became relevant because they chose to go with what the judge called a standing naked defense, their tactic. It was a touchy subject. He recognized it, but he chose to go down that path anyway. Do we have an IAC claim in here? Yes. And that's kind of where I had intended to start today, but I'll jump there right now, Your Honor. There was a California Supreme Court habeas petition filed by appellant in 2005. The California Supreme Court ruled and denied habeas, issued a denial order in 2006. Most significant was an exhibit attached to the California Supreme Court petition. I have it in my hot little hands. It's written by the public defender explaining to appellate habeas counsel what his tactics were. He said in that. Do we have it in the record? Yes, it is. Where is it in the record? It's in the sixth volume of the excerpts of record, and it's page 998. It's dated July 28, 2005, and it's written to counsel Fleming, who was the state appellate counsel as well as the state habeas counsel. I guess she wrote trial counsel a letter in support of her IAC claim in the California Supreme Court and said, what were your tactics? He basically indicated that there were three. Number one, I chose not, there was no objection to the entirety of the closing argument. He said, I chose not to object for three reasons. Number one, I was relying on the CalGIC 1.0 instruction that the statements made by the attorneys is not evidence, and of course the jury is presumed to have followed that. Does IAC as to the prosecutorial misconduct claim? That's what you're addressing. I'm wondering if there was an IAC as to representation by trial counsel. As to choosing to go with that defense? None at this court. And state court? None. Literally, I'm hearing about it for the first time by the hypothetical. It has never been raised. That said, he indicated also that he chose not to object to any alleged misstatements or any alleged misconduct because he didn't want to highlight it. He didn't want to put the jury's focus on it by objecting. What he thirdly wanted to do was keep the jury focused on this altered state of mind defense. He just wanted the jury to stay there. He wanted the jury to stay focused on altered state of mind, and it shows the method to his madness from the first 402 hearing to years later in his letter to appellate counsel slash California Supreme Court. It was lodged, by the way, Lodgement 14 in the district court, and as I indicated, it is in the Excerpts of Record, Volume 6. But what it shows is that his tactical basis was, again, he was relying on instructions from California law, number two, he didn't want to highlight anything, and thirdly, he wanted to keep the jurors focused on this state of mind defense because, as the judge, in my mind, rightfully termed it, he wanted this standing-naked defense before the jury. And I might add, Judge Goodman, you indicated something in your questioning to my colleague, which I appreciate. I would slightly like to try to rebut. It didn't read to me at all that the appellant was psychotic at trial. I mean, for example, there was a banter questioning back and forth between the prosecutor, and I do have the cites, the prosecutor and the appellant as to why he thought this looked suspicious. Why did he go through this door? At one point, the prosecutor said, well, if it looked suspicious, why did you go in? I mean, it wouldn't have been, would it not have been dangerous? And he said, well, on the other hand, I could have been doing someone a favor. Someone may have been in distress. On the other hand, hey, they don't have my fingerprints on this stuff. That's all I can say. It wasn't like, oh, my God, they don't have my fingerprints, as counsel characterized it today. He went on and on and on throughout the trial, indicating his cognizability. He indicated that he knew right from wrong with respect to vandalism and trespass. He indicated that, as I indicated about the fingernails, he knew that it was wrong to steal, he said. He knew it was wrong to enter an uninvited house. He described the neighborhood as a place where he grew up, as a place where he grew up, Your Honor, a place where he had previously lived. This was very important, because based on the photos of the property, the front house, Mr. Crockett's house, the prosecutor argued ad nauseum that this was a very, I'm using his words, a very prosperous-looking house, close quote. And far from being a suspicious-looking house, the prosecutor's argument was this was a very prosperous-looking house in an area where the defendant grew up in, miles away from his own home, to which he entered at wintertime. It's cold. It's 730 at night. It's dark. The defendant essentially believed at 730 with no lights on, someone must not be home as opposed to being asleep, because we're not talking about 2 a.m., we're talking about 730 a.m., stringing all that together. The prosecutor's argument to the jury, in essence, is this was not a suspicious-looking house. It was a very prosperous-looking house. I'm sorry? It was a circumstantial case. Yes, but I'm flushing out just a few tidbits, a few examples of a very alive and kicking defendant at trial. He was asked about his medication. He said he was feeling fine at the time. Most importantly, he said he was feeling fine at the time of the trial. I think very critical reading for the Court is the third volume, Excerpts of Record, pages 474 through 75. There you have a series of questions asked of Appellant about his mental state, all culminating in the fact that he just flat-out denied that he had any mental problems that day. He was feeling self-preservation that day. He had been taking his medication up to that time. He was in very good spirits, he said. He testified to all of this. So not only did he admit the elements as to the germane burglaries, he was showing his lucidity at trial. He was fine at trial, Your Honor, respectfully. I am out of time as well, but of course, we would respectfully ask that Estelle versus McQuire be given very close scrutiny because in that case, in Part 1 of the opinion, eight justices said that if, and I think, Your Honor, it's gone to the point at the outset, if the State Court finds the evidence is relevant, there is no federal due process violation, period. Of course, in doing so, the Court reversed this circuit, but said, but said, but said, we're doing so because the State has found it to be relevant under its own law. This Court, this Court, the Ninth Circuit, as said the Supreme Court, in its interpretation of its own law, due process cross has limited utility, can't reexamination State Court determinations of its own law, et cetera, et cetera, et cetera. Of course, five years later, President Clinton signed the AEDPA into law. Of course, about 13, excuse me, 18 years later, the California Supreme Court, U.S. Supreme Court, excuse me, published Richter and Penholster. They're serious. Due process has limited utility in the context of AEDPA test. This was not an objectively unreasonable determination with respect to relevance or respect to anything else. And of course, Dale, he loses. All right. Thank you so much, counsel. Thank you. You're over your time. I'll give you two minutes as well. Thank you very much, Your Honor. Two basic points, Your Honor. And first off, I think that what counsel responded stated is part of the confusion that has existed in the trial court level and the appellate court level and all the way through this case is that he stated that having a psychosis and that having an antisocial personality disorder were opposite. And that was the confusion that arose in the court's mind at the trial level and also at the appellate level. In fact, Your Honors, as both of the experts testified, they're not opposite. One person can have both conditions. You can have both conditions in various degrees at various times. The thing that happened here is that during the frame of time that the court was very careful in framing, which was December of 2002, what the experts said was this person has a psychosis and this is the predominant thing that's going on with him now. Yes, he has antipersonality disorder. And in fact, again, I point out the prosecutor did a very good job in crossing him on what that was, what it meant, why some people could conform to rules, why others people couldn't. But these things can exist at both at the same time. And what the expert actually said is in terms of the psychosis, the antisocial personality disorder does not negate that. He can have them both. And in fact, that is what was going on here. Again, Your Honors, the timeframe, the specific details from 10 to 14 years earlier were just not relevant to the psychosis issue before the court and the court was confused about that. One last very quick question. They say that they were surprised, but as I pointed out in my brief, they received the reports through prior counsel and it's up to the prosecutor's office to make sure that all deputies receive the documents that they're given. Thank you very much, Your Honors. Thank you very much, counsel. Wilmot v. McCune will be submitted.
judges: Goodwin, Wardlaw, Gould